# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 15, 2015      Decided March 10, 2015

No. 14-5082

MEINA XIE
APPELLANT

v.

JOHN F. KERRY, AS UNITED STATES SECRETARY OF STATE,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-606)

———

*Christopher A. Teras* argued the cause for appellant. On the briefs was *Mike Meier*.

*Aaron S. Goldsmith*, Senior Litigation Counsel, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Stuart F. Delery*, Assistant Attorney General.

Before: HENDERSON and MILLETT, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Meina Xie alleges that the Department of State is illegally delaying review of visa applications filed by persons in certain immigration categories. The district court dismissed the complaint, finding that Xie had failed "to identify any *discrete* agency action that [State was] *required* to take." In the alternative, it said, she failed to point to "authority" legally requiring the relief she sought. *Xie v. Kerry*, 21 F. Supp. 3d 89, 93 (D.D.C. 2014). But in fact Xie specifically asked for application of § 203(e)(1) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1153(e)(1). That section directs State to process immigrant applicants in the order of their filing:

> (e) Order of consideration
>
>> (1) Immigrant visas made available under subsection (a) or (b) of this section shall be issued to eligible immigrants in the order in which a petition in behalf of each such immigrant is filed with the Attorney General . . . as provided in section 1154(a) of this title.

8 U.S.C. § 1153(e)(1).

The district court did not mention this provision. While it may prove in the end that the broadly varying lengths of the queues for various categories of immigration applicants are consistent with § 203(e)(1)'s temporal priority mandate, Xie is entitled to have her claim assessed. We reverse and remand for further proceedings.

\* \* \*

The INA limits the number of annual visas to be granted to applicants for immigration to the United States. See 8 U.S.C. § 1101 *et seq.* Apart from § 203's first-in, first-out principle, the statute creates a variety of categories for which

visas are to be granted. For example, applicants seeking to qualify for employment visas must fit within one of the five employment-based "preference" categories enumerated in 8 U.S.C. § 1153(b), each subject to an annual cap. In addition, the statute imposes a country-based limit: visas for natives of any "single foreign state . . . under subsections (a) and (b) of section 1153" (relating to "family-sponsored" and "employment-based" immigrants, respectively) must constitute no more than 7% of visas issued under those subsections. 8 U.S.C. § 1152(a)(2). Because China and India are so populous, applicants from those countries are far more likely to be blocked by the country cap than those from other lands.

The employment-based preference category in which Xie is interested, "Skilled workers, professionals, and other workers" or the so-called "EB-3" category, is subject to a particularly complicated set of provisions and caps. See 8 U.S.C. § 1153(b)(3) (describing three types of workers eligible for EB-3 applications). The EB-3 category, itself subject to a general limit of about 40,000 visas annually, is composed of three subcategories. See 8 U.S.C. §§ 1153(b)(3), 1151(d)(1). Xie fits within the subcategory "other workers" or "EWs," which is intended for workers in occupations that require less than two years of training, education, or experience, and "for which qualified workers are not available in the United States"; it is subject to a separate cap of only 5,000 visas annually. See 8 U.S.C. §§ 1153(b)(3)(A)(iii), 1153(b)(3)(B) (defining "other workers" and limiting the group to 10,000 visas annually); 8 C.F.R. 204.5(*l*)(2) (further defining "other workers"); Nicaraguan Adjustment and Central American Relief Act, 105 Pub. L. 100, § 203(e), 111 Stat. 2193, 2199-2200 (1997) (providing a temporary reduction "by 5,000 from the number of [other worker] visas otherwise available").

In their papers before the district court and us the parties have been distinctly obscure about the interaction of all these limits. A declaration by the Chief of State's Immigrant Visa Control and Reporting Division suggests that the current annual EW limit for China is 319. See Declaration of Charles W. Oppenheim ¶ 14, *Xie v. Kerry*, No. 1:13-cv-606 (D.D.C. July 5, 2013), ECF No. 6-1. It appears (though is not really clear) that in arriving at this number State applied § 1152(a)(2)'s 7% country limit separately to the EW segment of the EB-3 applicants, even though the text of that section does not on its face require such treatment. *Id*. Fundamentally, however, the declaration tells us little about State's system. As to the determinants of the length of immigrant queues, the record provides little more than a black box.

Publically available "cut-off dates" provide a window into State's system. An applicant is able to schedule an interview and potentially obtain a visa to enter the United States only when the date of his or her application (what State calls each applicant's "priority date") is no later than the "cut-off" date for his or her group. Whatever State's exact system, this produces varying cut-off dates depending on visa category and country of origin. Below are the cut-off dates for Chinese and various non-Chinese immigrants in two categories: (1) EB-3 (non-EW) and (2) EW. See Visa Bulletin for February 2015, available at http://travel.state.gov/content/dam/visas/Bulletins/visabulletin_February2015.pdf.

**Cut-Off Dates for EB-3 and EW Applicants Globally**
**(From February 2015 Visa Bulletin)**

|  | China-mainland | India | Mexico | Philippines | Other |
|---|---|---|---|---|---|
| **EB-3 (non-EW)** | Sep. 1, 2011 | Dec. 22, 2003 | Jan. 1, 2014 | Jan. 1, 2014 | Jan. 1, 2014 |
| **EW** | Aug. 15, 2005 | Dec. 22, 2003 | Jan. 1, 2014 | Jan. 1, 2014 | Jan. 1, 2014 |

Section 203(e)(3) provides for the maintenance of "waiting lists of applicants for visas" "in accordance with regulations prescribed by the Secretary of State," suggesting the existence of potentially relevant regulations. And State argues that other relevant statutory mandates, such as 8 U.S.C. § 1153(g) (authorizing them to "make reasonable estimates" of the number of visas they anticipate issuing) and 8 U.S.C. § 1151(a)(2) (limiting the number of visas available in the first three quarters of any year), grant State additional discretion and justify deviation from the priority principle when creating the cut-off dates. But the parties haven't furnished any relevant regulations which would reveal State's view of how it meshes the categorical caps, the priority rule, and the other statutory directives, much less the thinking behind that view, and we have found none that do so. When we asked for such regulations at oral argument, counsel for State said he knew of no elucidating regulations. See Oral Argument Recording at 28:02.

6

* * *

Xie's EW immigration petition was received by State around January 17, 2007, so that she has now been in the queue for over eight years. She points to widely differing cut-off dates as between Chinese EW applicants (including her), other Chinese applicants in the EB-3 preference category, and EW applicants from other countries. Compl. ¶ 6. She characterizes the disparity between the Chinese EW cut-off date and the China (non-EW) EB-3 cut-off date as in "blatant disregard" of § 203's temporal priority mandate. Compl. ¶ 30.

The district court, without citing or discussing § 203(e)(1), dismissed Xie's complaint for failing to state a claim, finding, as we said, both that Xie had failed "to identify any *discrete* agency action that DOS is *required* to take" and that she had failed to point to any authority requiring the action she sought. *Xie*, 21 F. Supp. 3d at 93.

The second theory ignores Xie's express and repeated reliance on § 203(e); the first vastly overstates the rule articulated in *Norton v. Southern Utah Wilderness Alliance,* 542 U.S. 55, 64 (2004). The Court there observed that the only agency action that can be compelled under the Administrative Procedure Act "is action legally *required.*" *Id.* at 63. This of course takes us back to the point that Xie *did* assert a specific statutory requirement. It is true that in *Southern Utah* the plaintiffs had sought compliance with a statutory requirement, namely, that the defendant manage wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness," *id.* at 65, and evidently sought a court order mandating "compliance." *Id.* at 66. But the Court, wanting to "protect agencies from undue judicial interference with their lawful discretion," found that any such order would launch the

district court onto a path of "work[ing] out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Id*. at 66-67.

Here, Xie does not ask for compliance with a provision that is anywhere near as broad as the ones listed in *Southern Utah*. Rather, she points to a precise section of the INA, establishing a specific principle of temporal priority that clearly reins in the agency's discretion, and argues that the disparate cut-off dates for various subcategories manifest a violation of the principle. The priority principle must be integrated with the related INA requirements in some fashion, and Xie is entitled to have State's current approach ascertained and its lawfulness adjudicated.

To ultimately prevail, Xie cannot rely solely on the existence of the disparity in cut-off dates between Chinese EWs and Chinese non-EW EB-3s. Notwithstanding § 203(e)(1)'s priority rule, some of the statutory provisions appear to assure some differences in cut-off dates. For instance, because all countries are subject to a 7% ceiling, and because China and India are the world's most populous by a broad margin, the cut-off dates for Chinese or Indian EB-3 applicants are likely to lag behind those from less populous countries. Similarly, if EWs represent more than a certain proportion of the total EB-3 pool, imposition of the separate cap for EWs will produce different cut-off dates for the two groups.

The complaint further alleges that the current system produces not only a disparity in cut-off dates between non-EW EB-3s and EWs, but also unused annual EW slots—a combination possibly suggesting that State uses the separate pools in a way that yields greater differences in cut-off dates than any difference the statute allows. Thus State may be processing non-EW applicants before EW applicants who

have earlier priority dates, even when there may be open EW slots to fill. We've yet to hear State's response on that issue, or more broadly how State seeks to weave the various subcategories and the priority principle together. One potential interpretation of the statute (see Compl. ¶¶ 27-30) would be that it supports a system that places all applicants in a single list and works through it in temporal order, admitting each applicant in order unless an applicable cap makes the applicant ineligible, until all the caps are triggered.

In reversing, of course, we neither prescribe nor endorse any solution, and we recognize that State must take account of a variety of operational and other concerns. Accordingly we hold only that the consequences of State's current operations are quite consistent with Xie's allegations that it has inadequately heeded § 203(e)(1)'s priority principle. Once State's interpretation and application of the relevant provisions are reasonably clear, the court can assess their lawfulness.

The judgment of the district court is

*Reversed.*